Number 28, Adam, you're next on page 2. Brian, Shane, Connor, AJ. And then, Newton. This is Ryan, too. This is Benjamin. This is Brady. This is Austin. This is Angel. This is Nancy. This is Jordan. And that's all the pages. Thank you. If you may, please. The court, Peter Bensinger, Jr., for appellant Sayre. Here, the district court decision has set a dangerous precedent. It is being cited for the proposition that one looks solely to the indication section of the FDA-approved label to determine whether a method-of-use patent claim can be asserted in Hatch-Waxman litigation. And this is legal error. Under this court's decisions, under the FDA regulations implementing Hatch-Waxman, and the FDA's practice in this case, the infringement analysis is not limited solely to review of the indication section. In addition, the district court also erred in applying the Rule 12c standard by not accepting Bayer's allegations as true and by not resolving all the inferences in Bayer's favor. I take your point that the district court did refer on several occasions to the indications and usage section, but I'm wondering whether it's fairly characterized that the district court has relied exclusively on the indications and usage section of the FDA-approved label. I'm looking at page 10 of the district court's opinion, which the district court says none of these arguments are true. Undisputed evidence, including the indications and usage section of Yasmin's FDA-approved label and the FDA's letter approving Bayer's NDA claim for Yasmin, that Yasmin is only FDA-approved, produces an all-country subject. Isn't it fair to say, from that language at least, that the court was accepting indications and usage as one of the indications of approval and not the exclusive source of approval? It's true that the district court also referred to the FDA approval letter, but effectively what the district court did was treat the approval letter as related solely to indications, and that was an error. Let me quote from the approval letter. Well, the court could be fair to the court. The court said undisputed evidence, including the indications and usage and the label, and that's not what was said. Including A and B means there were the other two. Well, it does refer to them, though. But go ahead. Well, it's significant in this case that the approval letter says, the drug product is safe and effective for use as recommended in the agreed-upon and closed labeling text. And here, we have factual evidence that the FDA approved the patented method, and the district court, through the legal rule it created, avoided this factual evidence, as well as the FDA's interpretation of its own regulations. What is the factual evidence that the FDA approved the patented method? I thought that's the issue before us. Well, the issue here is whether the FDA approved the method of inducing simultaneously three pharmacological effects. The imperceptive effect, the anti-mineral or corticoid effect, which is the water retention, and the anti-androgenic effect, which is the anti-testosterone. Okay, sure. Just be helpful to me, because I'm not as smart as you are when we say A.M. and A.A.M. Absolutely. I have to do it. I can't pronounce all those three words. So, we're going to talk about three effects, contraception, A.M. and A.A.M. Correct. That's clearly what was in the method that was patented. Correct. And the argument seems to be, did the approval of the FDA for the use of the drug in certain activities include all three of those or just the contraception? Do I understand the issue? I think you do, and I think it's clear that the FDA-approved label describes all three effects. That's undisputed. That's undisputed. And the question is, when the FDA approves the undisputed label, does that mean that they approve all three of those activities or just the one that's contained in the indication of the use of the drug? And that was the opening dialogue you had with Jeff Tyson. The puzzle I have, which I have a lot of questions about, the one puzzle I have is Section 314.53.C.2.I. Forgive me. It says that the NDA filers have to identify, quote, the quote, specific section of the proposed labeling that corresponds to the method of use claimed by the patent submitted. Correct. What did you all, in your submission in response to that, what did you say? I couldn't find that in your record. The language you just read from the regulation is the current language, which was not applicable to their submission at the time of Orange Book listing. But the provision is very significant, because a fundamental error of the district court didn't hear it. In your answer to my question, you all didn't file a response to that because it wasn't applicable? Correct. So we don't know what Bayer thought it was submitting. Bayer didn't have to point to a specific section in the label at the time Bayer submitted its Orange Book application? You didn't have to put a code number on it? The FDA assigned a use code. A use code. And that is what's significant. A use code is only for contraception. That's correct. Here what's significant is the district court did not give deference under the Supreme Court Chevron case to the FDA regulations implementing Hatch-Wax, to FDA's own interpretation of how to read the statute. The language just read states, identified with specificity, the section of the approved labeling that corresponds to the method of use claimed. That indicates that one can look outside of the indication section in order to find the FDA-approved use of the method. Here, the description is in the clinical pharmacology section as well as the indication section. Had that been done, had that regulation been in effect at the time Bayer filed for the Orange Book, presumably we wouldn't be having this discussion. Is that correct? Had the language been operable, Bayer would have described the indication section, which covers the contraceptive effect, and the clinical pharmacology section, which describes the two attendant pharmacological effects that go with the contraceptive effect. There's no evidence to support that. That's your argument, that Bayer wouldn't have done that? That's true. It's not in the record. It's hypothetical. But what's significant here is the patent statute itself does not define the word use for purposes of Hatch-Waxman litigation. The statute doesn't say you cannot look anywhere but the indication section. And under Chevron, the district court should have deferred to the FDA agency interpretation of an ambiguous statute, where Congress empowers the agency to implement the statutory scheme. And here Congress empowers the FDA to implement Hatch-Waxman. The FDA implemented the regulation 21 CFR 314.53b, from which we just read. But the language that operated at the time was, quote, For patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use that are described in the pending or due application. So the regulations do not refer solely to the indications. They refer to other conditions of use, which here are the attending pharmacological effects that occur when you administer drospirinol. Well, I don't want to cut you off, but you're in the middle of the discussion this time. But when you get to the end of that point, the point you're discussing, I want to ask some more basic questions. Go ahead and finish it. To finish this point, the regulations do not limit inquiry to the indications section only. Instead, they indicate one can look to the entirety of the label to find support for the FDA-approved method. In fact, the FDA issued written commentary on this regulation, and it stated that if the FDA has already approved the NDA, which is the case here,  one must claim a method of use that is in the labeling of the approved NDA. That's the 59 Federal Register 50363. So we have the FDA's interpretation that you can rely upon parts of the label other than the indication section to find an approved use. Here, there's no question drospirinol has the pharmacological effects, the AMC and AA effects. That's undisputed. It's also undisputed the FDA-approved label describes those effects. It's also undisputed that the patent claim covers the indication contraception as well as the two pharmacological effects. In this respect, it's important to recognize that Warner-Lambert does not decide his case. Now, are you finished with that point, or are you moving on to another one? I'm going to discuss Warner-Lambert. Should I take your question? If you would, please. I take it that in light of our recent decision and another case involving this drug, that you have no protection, no valid patent protection for the drug itself, correct? Correct. All right. So is it also the case that you have no patent protection for the method of use of the drug for contraception, period? Yes. Okay. So I take it that if I prescribe the drug for someone who is not in need of the other aspects of the drug, I would not infringe, correct? Yes, that is true. I would not infringe this patent. The claim requires, for a patient in need, they're not in need. It's perceived to be in need of the diet. Usually, it's going to be diagnosed. But we'll set that question aside because I understand that's disputed. But it's perceived to be in need of AA and AB. AA. AA, I'm sorry. So the question is then, why is it a problem when the method that is described by your opponents does not include the benefits of AM and AA? That results from confusion between pharmacological effects and clinical outcomes. Well, I guess where I'm going with this is this. If it is, in fact, perfectly permissible to employ the drug for contraceptive purposes, without regard to whether it has these other effects, then why is it that if somebody doesn't suggest that they'd be used to these other effects, that that would constitute infringement? Well, here you have a patented method that involves inducing these three effects simultaneously. But you're saying that automatically induces the other two effects. You're going to have to make reference to it, or you're prescribing for that purpose, or not? That's correct. So if that would catch everyone who prescribes the drug, well, correct me if I'm wrong, would that not catch everybody who prescribes the drug for contraceptive purposes? If they perceive there to be a need for these additional pharmacological effects? Yes. Now, pharmacologically, the question that's being asked is, let's assume a doctor prescribes the drug, which is a combined drug. Hypothetically, let's assume they're marketing, what is the name of it? Yes. They're marketing a generic version of gas, and the doctor prescribes it for contraception. But it has these additional, I suppose you could call them inherent qualities of dealing with AM and AA. Additional pharmacological effects that attend the use of the drug. Doesn't that infringe your patent? It would, where the doctors are prescribing it. Even if they don't know anything about AM or AA, they get a piece of literature that says, great for contraception. Use generic gas, and they prescribe it. The claim limitation includes the women in need thereof, which the parties have agreed means perceived need. So there's a limitation that would come into play here. Before I conclude, I just want to note that you can't conclude yet because we've got a lot more questions. I reserved a bubble of time. Before I sit down, I just want to note that in the Warner-Lambert case, the issue was not whether or not the drug was FDA approved. In that case, it was no question that the FDA had not approved the pathogen method. Here, it's different. Here, the FDA approved the indication of contraception, as well as the two pharmacological effects. Whereas in Warner-Lambert and Allergan, the approved use was entirely different from what the patent covered and claimed. That's a fundamental distinction. What we're talking about here, this is perhaps a lucid, perhaps imprecise term, but we're talking about this. You say these are consequences that are attendant to the principle function of the drug, at least historically. Is that correct? I do not believe it's correct to refer to them as side effects. Okay, I thought you might push back on that. Fair enough. Let's say other effects. I'm going to avoid the sort of nasty tone that comes with side effects. I'm not necessarily bad. But not all side effects or other effects are bad. So, are you suggesting that any time you have other effects that are described in the label, not in used indications, and not in a way that clearly indicates that the FDA has sanctioned these other effects as being therapeutically effective, but nonetheless calls out these other effects, that that constitutes FDA approval? In answering that question, let me give you an example. Suppose that you have something that says, one effect of this drug, this drug is very good, it's a cure for pancreatic cancer, it's a phenomenal drug, but it has the effect of raising blood pressure dramatically. Okay, I mean, raising blood pressure dramatically sounds pretty sad, but given the benefits of the drug, the FDA is going to say, well, you know, we live with that. Yet, there are perhaps some instances where somebody is in dire straits and needs to get their blood pressure up, and they will come, that having something that pops your blood pressure away is a good thing. The fact that that is a pure negative side effect, does that constitute FDA approval of that quality of the drug? It does for the use that's approved. So here you're administering the drug for a particular purpose. Yes, but that use is always present with the drug, and therefore if somebody prescribes that drug purely for pancreatic cancer, are they infringing a method claim that says method for use of pancreatic cancer in a patient in need of, or in combination with high blood pressure reduction or decrease? Yes, the law is that where you have an FDA-approved method, and you have an FDA-approved method that is covered by a patent, you can assert the patent. The premise of the question, though, is that the use is for pancreatic cancer, and that the patent covers the use for pancreatic cancer along with the attending other effects, and the FDA has approved the use of the drug for pancreatic cancer with the attending effects. Well, that seems to answer my question. My question is, does that constitute FDA approval, as we're using the term? My question comes down to basically this. Is it your position that FDA doesn't approve, for example, I suppose, a, you know, other effect of this causes heart attacks and strokes in some small but non-negligible number of people? That's not a proof we agree of that effect, because those are not beneficial effects. Okay, Dr. Gabor is coming up. So, if you say that the drug might have other effects, might be helpful in some cases, does that suddenly convert FDA disclosure of and willingness to tolerate other effects into approval? Each case you have to look at based on the individual fact. It depends on the specific facts of the case. What we know is that the FDA was aware of the pharmacological effects, knew the clinical pharmacology section of the label, approved advertisements specifically promoting the pharmacological effects, which the FDA would not have permitted if those effects had been unapproved or off-label. You could only advertise approved use of the drug. So here, the key fact is you have an indication that's approved, contraception, with attending pharmacological effects, which are known to the FDA, approved by the FDA, in the FDA label because they're important to prescribers. And therefore, when you prescribe the drug for oral contraception with these effects, for a woman in need thereof, you infringe the method patent. Your short answer to this question might have been for purposes of infringement under a paragraph or claims under Act X, and the answer is yes. That might have been your answer to this question, but that's really the issue, isn't it? It is. Now, with the presiding judge's permission, I have one short question. Okay. I looked over in that far corner of the room, if you'll take a look over there, do you see the 600-pound gorilla in that corner? That's the FDA. The only real question in this case, the underlying question, is what did the FDA approve? Why isn't the FDA here? Why are we a party to this litigation? The FDA is not a party to litigation because we have a patent that Hesh-Waxin permits us to assert under these circumstances. The argument between you two is purely what is it the FDA approved, and why don't we ask the FDA that very question? The question is whether one can rely upon the description in the clinical pharmacology section to support FDA approval of the use. We also have factual testimony here from the director of the FDA division that actually approved the asthma, and the district court disregarded that testimony, finding it not credible, because the director said, we reviewed this application, and we approve this method, the pharmacological effects along with our own contraception. So the answer is we don't need the FDA. We have their implementing regulations that we discussed. We have FDA approval of asthma affirmatively promoting the method which we discussed. And we finally have the director of the division who attested they approved it. On this basis, the district court erred, applying the Rule 12 fee standard. It should have resolved the factual inferences in their paper, and should have allowed the case to go forward. I'd be grateful for the shortest rebuttal time. We can do February by the time we have some difficult questions to ask. Thank you, Mr. Levy. Thank you. Mr. Jenkins. Yes, good morning, Your Honor. Mark Jansen for Washington Laboratories, and Joseph Hines, who's here for Sandoz, and Christopher Griffith representing Lupin. I made the argument before the appellees. May it please the court. This case, in my view, is essentially they are taking a patent that does not cover oral contraceptives. And applying it to an oral contraceptive. There is one use code, one use code issued in this case, is the use code for oral contraception. That is all that the asthma is approved for, oral contraception. There are potential side effects. One of those is anti-M. And I think the court is aware, we can look to the record, the FDA required bolded warning about that potential risk. The FDA does not need to approve an anti-M effect. Nor do you have to look at the label. And I think here, the question is what does the court, this court below, what it looked at? And what should it look at? And there's a 600-pound gorilla in the back corner. I don't think that that 600-pound gorilla needs to be here or be heard from because what a permitting agency permits, whether it's a building permit, a liquor license, or a drug permit from the FDA, is to look at the application that was made by the applicant, look at the permit that was issued, and that permit includes the letter of approval from the FDA and the labeling. The labeling provides information that's needed by doctors to make a determination as to how and whether to prescribe that particular drug. But it doesn't mean that the agency has approved the therapeutic effect. I'm going to interrupt you for just a moment if I may. I have the sense that you're really sort of trying to squeeze through a very small hole in the Atraxin statute. And let me explain what I mean by that. The issue is whether Bayer can bring an infringement suit against you under Atraxin, not under general infringement law, right? So the question here is in paragraph 4 of the certification. Can Bayer sue you under this statute? And your answer is no because when we sell gasoline, which is what we want to do in its generic form, we really aren't infringing their patent. Even though we're selling exactly the same patented method for that particular drug, we're going to sell the same drug for that purpose. And the reason is because it's not clear, at least your argument is clear from the record, that the Orange Book listing is only for contraception. That's not the... I understand your question. I'd be happy to answer it. Would you? Because that seems to me to be where you are. They're arguing, no, it's not just for contraception. The Orange Book listing covers the whole method, including what you're now calling side effects, which you call the inherent properties of this combination of drugs. But it seems to me you're going to do exactly the same thing they're doing with their drugs. Why is that? What is this whole argument about? Well, let me back up a little bit. I think we have to look at the patent. What does this patent really cover? The patent is not an all-contraceptive patent. It's been made very clear here that, number one, prosperity on use in the public domain, prosperity on use for contraception is not patentable. It's not covered by a patent. That's the reason that they got the patent. They had to get a patent for what essentially is hormone replacement therapy for older women. Because the claim language requires treatment of women in pre-menopause, which are women essentially over 40. But your answer is for the combination, is that right? What's that? But the answer that's in debate, and this has facts and procedures for the combination, is it not? Not at all, no, no. I'm going back to the statute. 271B of 2A allows a lot to be brought earlier, before we get FDA approval. But there still has to be one statute. And even if that's allowed, and that's a gatekeeping function governed by the Warner-Lambert case, this court in Warner-Lambert says that in connection with 271B of 2A, which allows a total lawsuit, it's limited to control-of-use patents, or patents that claim an approved use of a drug. So, they have to show, or it has to be shown by somebody, that the FDA has approved the use in that patent. That's the question before this report, and I think this report does a very good job of answering that question. But that's a gatekeeping function. And just as in Warner-Lambert, there were multiple uses for the drug issue, the approved use was for a treatment that the urological patent had expired. The plaintiff had another patent which covered other effects, which necessarily occurred, but that was not an approved use. Therefore, under Warner-Lambert, and under 271B of 2, that patent lawyer could not bring the case. They could bring the case, after Watson and Sandler and Lupin go to market, there can still be a traditional lawsuit brought, but if it was sent a 6-by-2 patent, it's not infringed. As an answer to Judge Bryson's question, a counsel candidly admitted, unless a doctor is prescribing to an older woman, in pre-menopause or menopause, for three purposes, three therapeutic purposes, there cannot be infringement. This requires treatment of a patient in need thereof. So that means a doctor has to say, you need anti-age, you need anti-amp, and you need contraception. Therefore, I'm going to prescribe to you. That's the only doctor that would directly infringe. You're arguing that if you pick one of those three and say, I want to market their drug for only one of the three, I can do that without Pat Watson infringing. First of all, it's a hypothetical. It's not going to happen because Watson is a generic, or any of the appellees here, only markets according to the label. And they're forbidden, just as Bayer is forbidden, from marketing the anti-amp or anti-age properties because those are not approved uses. And that's why Bayer, to the extent that Bayer would let her, accusing her of improper advertising. Take a look at, it would be 80940, it's a letter. If I heard Mr. Benson, the arrest of Mr. Benson, he said it is approved. Approved. He's absolutely incorrect about that. When you say the label, It's for marketing the anti-amp product. You're saying they can't market that product. Bayer can market, can advertise, they cannot advertise anti-amp or anti-age properties because those are not approved. The NCAA has not approved those uses. The court looked at what's been approved. In order to get approval of a therapeutic effect, a therapeutic effect, which is what this patent covers, there has to be clinical studies done. There has to be a showing to the agency's satisfaction that the drug is safe and effective for the purposes as to which approval is sought. Bayer only sought approval for contraception. You can take, you can just simply look at their application, but if you look at the letter that was sent by the department based on the advertising subsequently at 940, you'll see that the bottom of 940, the agency reiterated its concern that prosperinone has got these anti-amp properties, which means that it can work against the body's normal mechanism for regulating salt and water balance, a situation that can lead to hyperkalemia in high-risk patients, resulting in potentially serious heart and health problems. This additional risk is described in bolded warning. I mean, that doesn't say that the agency has not approved that use. I don't know what does, but on the next page, this is page 940 and 941. This is what they do. Yeah, they join appendix 940 and 941. In 941, the FDA is not aware of any substantial evidence of substantial clinical experience demonstrating the absence of a cure to other combined oral contraceptives or the drug prosperinone from the absence of clinically beneficial. On the contrary, FDA is aware of the added clinical risk associated with prosperinone as communicated in the warning and bolded label warning. If we go to the approval letter itself, you'll see, and this is at page 307, this is the critical evidence which really constitutes what did the agency approve. This new drug application, and this is at page 307, this new drug application provides for use of diazolamin 28 tablets for oral contraception, oral contraception only. That's the only approval that was sought. That's the only approval that was provided. And there's a label that was approved with it. The label is for information purposes, and it does refer to clinical pharmacology. And I would point out to the court that while we're talking here about alleged approved effects, the agency and the label never used the word effects. It referred to the fact that prosperinone is a spironolactone and I'm at page 312, which is the approved label. So the clinical pharmacology draws prosperinone as a spironolactone analogue with anti-myelocorticoid activity. Okay? Preclinical studies have shown that prosperinone has anti-androgenic activity. So the FDA was careful not to use the word effects, number one. But number two, and what's more important is that those effects were not approved as a therapeutic treatment or therapeutic effect. These are things that may happen in the body, according to some animal studies. And so this information is provided for information purposes only. I think one thing that I would like to point out to the court, which was not cited at length, or maybe it's cited at all, is to lift the red on the labeling. Because I think it sort of points out what's really happening in the labels here. It's a provision of scientific information that is needed for the safe and effective use of the drug. And that's Title 21 CFR 201.5608, General Requirements. I just read from Sub 1. Two, the labeling must be informative, active, and neither promotional in tone nor false or misleading. And really important, Sub 3 to that. The labeling must be based, whenever possible, on data derived from human experience. No implied claims or suggestions of fraudulence may be made if there is inadequate evidence or safety of safety or lack of substantial evidence of effectiveness. So just because it's in the label, and a reference is made to the label, that's for a doctor to take into account when he makes a decision whether or not to prescribe that versus some other drug alternative to a patient. But it's not an approval of the therapeutic use, which is required to have the 652 method approved as required by Warner-Lambert. But just to back up, come back for a minute to something you said earlier. You said there still could be separate infringement litigation after all of this drug use has gone away. Maybe we shouldn't go there because it's not before us, but it would help me understand you're arguing no infringement of this patent because the patent does three things and you only want to do one. Do I understand that? Well, let me back up a little bit because the contents of the Hatch-Waxman Act, in this particular statute, 271e sub 2, is a provision that creates a hypothetical lack of infringement in the filing of the application. Nobody's gone to market. Nobody's actually engaged in any kind of infringement. And the value to the drug companies is that they can file that lawsuit and they get a 30-month automatic stay of FDA approval without needing to get a preliminary injunction to show whether there's a likelihood of success on the merits of infringement or validity. So that obviously isn't 30 months of not having to worry about generic competition, which is the purpose of the Hatch-Waxman Act to promote generic competition. But filing a lawsuit is simply a procedural, essentially, it's sort of like scanning the suit early. They still have to make out an actual claim of infringement. Now, in this case, of course, the generic company can't directly infringe a method of use patent. Only a doctor can infringe and only if he prescribes to an older woman who is in perceived need of three simultaneous effects. So I've got a doctor, I have to be treating a woman who's 40 or over. I say, you need anti-M, you need anti-A, and you also need justice, you have to have contraceptive effects. I'm going to prescribe this drug for that purpose. That's a direct infringement. Now, as we all know, I don't think it's essential that the court should take judicial notice, most women who take all contraceptives are younger women. If you look at the label, in fact, there's a warning against women over 35 that there might be adverse risk of taking all contraceptives. So... Let me ask you a simple question that's still troubling me. If, in fact, the producers now, your clients, seek FDA approval of their products using the ANDA procedure, don't they need to rely on the prior information data that the FDA used in order to approve the action in the first place? The generic company can put the drug on the market. In the case of Watson, we have to put the drug on the market if a 30-month stay has expired. We simply make pursuant to the label, and... No, I'm sorry, because it's already been approved. We have to use the same approved label, and that label will be the basis. The only claim that can be brought to the effect of your question is a claim for induced infringement. Couldn't be liable for induced infringement. Now, this is one of the things we haven't talked about here today at all, but... And I think they've actually waived the argument. They can't win this case unless they can do two things. One, if the FDA approved all three uses, which it did not, or... And then they have to say, moreover, your labeling instructs doctors to use for this purpose. That label can in no way be considered to instruct doctors to use for all three purposes, because it simply provides... This is indicated for prevention of pregnancy. And, oh, by the way, there's a serious risk of injury if your client may be susceptible to this anti-age, this anti-age effect. I used it my time today. Do I... Do you have any more questions? No. No, no. But I think the bottom line here is the FDA has not approved this therapy therapy effect. The FDA has not approved this therapy effect. And just, if you look at the allergy case, this court's decision in allergy, there, again, there was a... There were two patents, one of which covers this, and it lets in here the so-called inherent effect, we could say the inherent effect of protecting the eye nerve. But the only use that was approved was for the drug for reducing interocular pressure. That patent had expired, and the court held rightly that this court held rightly that there was no claim, ability to bring an early loss under 271-EC2. Thank you, Your Honor. Thank you. Thank you very much. The FDA knew Prosperinone had anti-mineralocorticoid activity. And the pre-launch materials that were pre-cleared by the FDA, this is in the appendix of 826, have the anti-mineralocorticoid activity and the anti-androgenic activity. So this is not a matter of simply a side effect. This is a drug that has these properties which the FDA reviewed and approved for use in oral contraception. This is appendix 904 and 905. And what's important to recognize is the pharmacological effect, which is here described, is not a therapeutic effect. The generics keep characterizing this as if it were a therapeutic outcome, and it's not. It's chemistry that happens within the body to block certain receptors. This is what makes it a pharmacological effect. The FDA knew this and required it. I'm completely lost. It's therapeutic, correct, in the sense that it treats a condition which a physician wishes to treat a patient who has it. What? That's not correct. It is a pharmacological effect that is of relevance to the doctors. It is not treating a disease. But it is therapeutic effect, right? It has... Beneficial effect. Let's stay away from the word therapeutic. It has potential beneficial effect for some patients and some doctors. The doctor may perceive that it has a benefit. What the label says, and what the FDA approved, is administration of prosperolone for oral contraception together with the anti-minolocorticoid effect and anti-androgenic effect. Pharmacological. That's what the label says, that the exact label that the generics wish to market will induce infringement. This is not a case where the doctor is prescribing the drug to treat acne or treat bloating. That would be a different case. Our case here, the indication is oral contraception. The script is written for oral contraception. And the pharmacological effects attend the oral contraception. And the FDA has approved that label and that use of the drug. It's straightforward under the court's authorities that where you have an approved label and a patent that covers the approved label, you can proceed in the district court with your infringement case. That is what is going on here. That is the reason that this court should reverse and remand so that proceedings can continue before the district court. Otherwise, we create a situation where we cannot protect innovation on the ground that some pharmacological effect or some dosing regimen or something kind of outside of the indication section is no longer FDA approved. Even though it's in the label and the FDA implementing regulations say you can look to the label as a whole to find the approved. The 30-month... The 30-month... Excuse me. The freeze has expired? Yes. Then... What's the litigation about? Well, there's ongoing... Well, the litigation now is before you as to whether we can proceed. I'm reading. What's the point of proceeding with that harassment at this point? Well, at this point, we have an issue that we need to resolve so that we can continue to pursue our claims against all defendants. There are three. Not all. Yes, not all. But you're pursuing your claims under that class? Yes. And if you win here, we should grant you completely everything you want. Then you get a deduction from the district court. We would proceed in the district court to allow proceedings to proceed and prove up our case. Thank you very much. Thank you.